In re DON & LIN TRUCKING COMPANY, INC., d/b/a D & L Trucking, Debtor.

Bankruptcy No. 88–09574 (11).

United States Bankruptcy Court, N.D. Alabama.

Jan. 19, 1990.

Harry P. Long, for debtor.

D. Patrick Harris, for Redwing Carriers, Inc.

FINDINGS AND CONCLUSIONS UPON
RULE TO SHOW CAUSE AND UPON
TWO MOTIONS OF THE DEBTOR

L. CHANDLER WATSON, Jr.,
Bankruptcy Judge.

*Introduction—*

The above-styled case is pending before this Court upon the debtor's petition filed pursuant to title 11, chapter 11, United States Code, on September 30, 1988. On November 21, 1989, the case came on to be heard before the Court upon the following matters:

1. A rule to show cause as to why the case should not be converted to a case under title 11, chapter 7, United States Code, or dismissed out of court for the want of a plan of reorganization and disclosure statement and the Court's conclusion that progress toward a reorganization was lagging;

2. The debtor's subsequent motion for leave to reject a contract between the debtor and Redwing Carriers, Inc. (hereinafter "Redwing"), by which the debtor furnished and Redwing used eight over-the-road freight tractors in the business of hauling freight for hire over the public highways; and

3. The debtor's subsequent motion for leave [notice of its intention—?] to lease said trucks or tractors to Fleet Transport Company, Inc. (hereinafter "Fleet").

Redwing filed an objection to each of the debtor's requests or notices, and it and the debtor were represented at the hearing by respective legal counsel. A small amount of oral testimony was presented by the debtor, and all matters were submitted to the Court for its determination of them.

*Findings of Fact—*

■ The debtor claims that Redwing breached their tractor-lease contract, but Redwing claims that the contract was breached by the debtor. The testimony presented to the Court was to the effect that the debtor was successfully operating its business and was current in paying its postpetition obligations, including withholding taxes. The Court finds that the debtor should be given a limited, additional opportunity to propose a plan of reorganization and that the case should be dismissed if the debtor does not thus proceed with its reorganization. There is no indication that it would be to the advantage of the creditors or to the estate for the case to be converted to a case under chapter 7 rather than dismissed, and the Court presumes and, therefore, finds that, in such event, a dismissal would be in the best interests of the estate and of the creditors.

The remaining facts pertinent to the matters before the Court, primarily, must be gleaned from statements in the pleadings or in the briefs of counsel or must be extracted from the tractor-leasing contract, a purported copy of which is attached to the brief of the debtor's counsel. In the absence of any "better evidence" and because the remaining facts do not appear to be substantially in dispute, the Court will treat these sources of information as a stipulation of facts; and, accordingly, the Court finds therefrom as follows:

1. The original term of the contract was from July 17, 1988, through December 31, 1988, and provided that, during the term of the contract, the debtor would furnish tractors (trucks) and drivers therefor to Redwing to be utilized in Redwing's business activity of hauling merchandise for hire over the public highways;

2. By the terms of the contract, the debtor obligated itself not to haul freight within any geographic areas in which the debtor had "operated for Redwing" or to solicit any freight-hauling within such geographic areas;

3. The contract specified that the ban on activities by the debtor in competition with Redwing's business would exist not only during the term of the contract but for a period of two years immediately following the termination of the agreement, "regardless of who initiated the termination ...";

4. The contract appears to be ambiguous as to whether either party could terminate the contract prior to the end of its stated period (December 31, 1988), but the contract provided that (if neither party had given notice of a desire that the contract not be extended, at least 90 days prior to December 31, 1988) the contract would be extended for one year and that the contract would be renewed from year to year unless either party gave a termination notice at least 90 days prior to the last day of the contract year;

5. The debtor's motion for leave to reject the contract is the only notice of termination which has been given;

6. About October 1989, the debtor ceased doing business with Redwing and began engaging in a similar business with Fleet, which was and is a direct competitor of Redwing;

7. The debtor claims that Redwing breached the contract and denies that the debtor has done so, but Redwing claims that just the opposite is true;

8. The business relationship between the debtor and Redwing has deteriorated to the point of hostility and open conflict between these parties, the contract has not been terminated according to the contractual provisions for termination, the contract is now burdensome to the debtor's estate, and no equitable principal would prevent its termination by the debtor in accordance with the provisions of the contract; and

9. Likewise, there is no reason why the debtor should not be permitted to "reject" the contract as provided in 11 U.S.C. § 365.

*Conclusions of Law—*

■ The *not-to-compete* obligation is the basis for the present dispute and legal maneuvering of the debtor and Redwing. Notwithstanding this provision in the contract, the debtor has begun to engage in the tractor-leasing arrangement with Fleet, a direct competitor of Redwing, and in total disregard of the ban on the debtor's engaging in a business in competition with that of Redwing. Although the debtor appears to be proceeding in overdrive along this route, it apparently sees disturbing glimpses of the competition ban in its rearview mirror. Apprehensive that it may be ticketed with an injunction and left to sit on the shoulder of the highway, the debtor now seeks to "reject" the contract *in toto* and to obtain the blessing of the Court upon its new-found relationship.

If the debtor has acted in time, it could have given a notice on or before October 2, 1989, and terminated its contract with Redwing, effective December 31, 1989, but this divorce of the parties would not have wiped the slate entirely clean and would have left the debtor with the contractual ban upon its competing with the business of Redwing. Instead, the debtor has undertaken to avoid the alimony-like obligations of the relationship between it and Redwing by a § 365 "rejection," which the debtor apparently perceives as more nearly akin to an annulment of their relationship.

The divergent interests of the debtor and of Redwing with regard to the not-to-compete provision in the contract, thus, lead Redwing to oppose both the motion for leave to the debtor to reject the contract and the debtor's proposal that it enter into a similar contract with Fleet. The debtor, now seeking to legitimatize its affair with Fleet, contends that it may reject the Redwing contract and, upon doing so, may enter into a similar contract with Fleet. Redwing counters with the proposition that the statute, by its express terms, only provides for the rejection of *executory* contracts and unexpired leases. 11 U.S.C.

§ 365(a). Redwing says that the debtor stopped doing business with it, that it no longer has any obligation to perform any duty under the contract, that the agreement is no longer executory, and that it cannot be rejected under the statute. But Redwing follows a somewhat separate line of thought and also contends that the not-to-compete obligation rests solely upon the debtor and, not involving any obligation to be performed by Redwing, does not encompass unperformed obligations of both parties and cannot be termed "executory". However, Redwing then takes a turn and argues that the ban on competition by the debtor is negative, does not require any performance or affirmative act by the debtor, and thus, cannot be termed "executory." The debtor retorts that the roadblock to Redwing's analysis is that Redwing proposes to split the contract into parts and have the debtor reject only the part as to which Redwing's feelings have now grown cold. The debtor says that the contract must be assumed or must be rejected as a whole and cites the early decision of *Burger King Corp. v. Rovine Corp. (In re Rovine Corp.)*, 6 B.R. 661 (Bankr.W.D.Tn.1980).

The law apparently has never been very well-settled as to what is exactly an "executory" contract. A conclusive definition of an executory contract appears to elude all who attempt the definition, and often there is little agreement as to whether a particular legal relationship constitutes or does not constitute an executory contract. In *Rovine*, the late Judge Leffler [1] outlined some of the thoughts which had been expressed on the subject of executory contracts, as follows:

Probably the most compresensive analysis of the term "executory contract" as used in the bankruptcy context is found in Professor Vern Countryman's two-part article appearing in 47 Minn.L. Rev. 436 (1973) and 58 Minn.L.Rev. 479 (1974). This article concerns executory contracts under § 70(b) of the Bankrupt-

cy Act, the statutory predecessor to § 365 of the Bankruptcy Code.

Professor Williston in his work on contracts has stated that, "all contracts to a greater or lesser extent are executory. When they cease to be so, they cease to be contracts." 1 S. Williston, Contracts § 14 (3d ed. 1957). However, Professor Countryman notes that such an "expansive meaning can hardly be given to the term (executory contract) as used in the bankruptcy sense. Rather the term "executory contract" should be defined "in the light of the purpose for which the trustee is given the option to assume or reject." 57 Minn.L.Rev. 439, 450 (1973). Or in the words of the 6th Circuit Court of Appeals:

"The key, it seems, to deciphering the meaning of the executory contract rejection provisions, is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act." *In re Jolly*, 574 F.2d 349, 351 (1978).

Professor Countryman goes on to anaylze relevant court decisions on the subject of executory contracts in bankruptcy and states that the term does not encompass contracts fully performed by the nonbankrupt party, where the bankrupt party has only partially performed or not performed at all. 57 Minn.L.Rev. 439, 451 (1973). Nor does the term encompass contracts fully performed by the bankrupt party, but not fully performed by the nonbankrupt party. 57 Minn.L.Rev. 439, 458 (1973). The term executory contracts, however, does cover contracts where the obligations of both parties remain at least partially and materially unperformed at the time of bankruptcy. 57 Minn.L.Rev. 439, 460–461 (1973). The definition of executory contract offered by Professor Countryman

1. The late Honorable William B. Leffler, Chief Bankruptcy Judge, Western District of Tennes-  see.

and adopted by many courts is as follows:

"A contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." 57 Minn.L. Rev. 460 (1974).

6 B.R. 661, 664.

The present case would offer a wonderful opportunity for this Court to codify all of the thoughts on what is and what is not an executory contract and to resolve the problem once and for all, if the intellectual force and requisite time were available, but neither is at hand. A more direct approach to this dispute must be and will be taken.

The Court concludes that there is no legal or equitable impediment to a rejection by the debtor of its contract with Redwing. Neither party is performing the action-type obligations of the contract, but there has been no express termination of the contract by either of the parties. Consequently, it is appropriate for the debtor to seek approval of the Court for it to reject a burdensome contract. Redwing's objection to the debtor's motion to reject the contract is due to be overruled and the debtor's motion is due to be granted. These actions by the Court will be taken by a separate order.

The effect of the rejection of the contract is an entirely different matter, and a determination of the effect of the rejection upon the not-to-compete provision would ordinarily not be made by this Court except upon a complaint seeking declaratory relief. Bankr. Rule 7001(9).[2] In the present context, the Court is required to proceed to this determination because the motion of the debtor to reject the contract here is coupled with its notice of intention to lease its eight over-the-road tractors to Fleet, which intention is thrust into the lap of the Court by Redwing's objection.

It was concluded in the *Rovine* opinion that a covenant not to compete was a part of the agreement rejected by the debtor, as an executory contract, and that the covenant not to compete must be deemed to have been included in that which was rejected. 6 B.R. 661, 666. The debtor also relies upon *In re Allain,* 59 B.R. 107 (Bankr.W.D.La.1986); and upon *In re Register,* 95 B.R. 73 (Bankr.M.D.Tn.1989), *aff'd,* 100 B.R. 360 (M.D.Tn.1989). Compare, however, *In re Cutters, Inc.,* 104 B.R. 886 (Bankr.M.D.Tn.1989). In *Allain,* Bankruptcy Judge Smallenberger[3] stated that the "severability" of a "noncompetition clause" should be determined by the intention of the parties as evidenced by the terms of the agreement, its purpose and subject matter. Concluding that "the parties contemplated the entire fulfillment of the contract," the Court refused to lift the stay under 11 U.S.C. § 362(a), so as to permit enforcement of the agreement not to compete. 59 B.R. 107, 109. In the *Register* case, Judge Paine[4] refused to enjoin the debtors from conduct which was contrary to their agreement not to compete, contained in a franchise agreement. There, Judge Paine stated the following:

The primary purposes behind allowing debtors to reject executory contracts are (1) to relieve the estate from burdensome obligations while the debtor is trying to recover financially, and (2) to effect a breach of contract allowing the injured party to file a claim. [citations omitted].

Both of these goals are furthered by permitting debtors to reject covenants-not-to-compete with the rest of the executory contract. In fact, equitably enforcing such clauses in contracts that have been rejected would directly frustrate the purposes of relieving debtors from burdens that would hinder rehabilitation. For these reasons the debtor should be able to reject the covenant-not-to-compete along with the rest of the executory contract; Silk Plants, Etc. should then be

---

2. See Bankr. R. 7003 and Fed.R.Civ.P. 3.

3. The Honorable LeRoy Smallenberger, bankruptcy judge for the Western District of Louisiana (now retired).

4. The Honorable George C. Paine, II, Chief Bankruptcy Judge, Middle District of Tennessee.

able to file a claim for the injury resulting from that breach of contract under § 502(g) of the Bankruptcy Code. *See Rovine*, 6 B.R. at 666. This is also consistent with the general rule that executory contracts must be accepted or rejected as a whole. 6 B.R. at 666.....

95 B.R. 74.

For support of its objection to the debtor's effort at a ceremonial blessing of the relationship established with Fleet, Redwing cites the opinion of Judge Pelofsky[5] in *In re Cooper*, 47 B.R. 842 (Bankr.W.D. Mo.1985). There, the debtor had left his former employer and had taken employment with a competitor, contrary to a not-to-compete clause in his employment contract with the former employer. The former employer was granted leave to proceed with a state court action on the not-to-compete clause, over the objection by the debtor that he had rejected (or had the right to reject) the contract, as provided in section 365. *Accord In re Carrere*, 64 B.R. 156 (Bankr.C.D.Ca.1986) (dictum).

Here, neither party has established by the "evidence" that the other has breached the contract or that it has been terminated, although neither party is engaging in any active performance of any obligation under the contract. Redwing's objection to rejection of the contract by the debtor stands overruled, and the contract stands "rejected." A doubt lingers as to whether this excised the not-to-compete obligation from the debtor, and Redwing contends that it is this obligation itself which lingers. If so, this is off-key to the theme of section 365, as understood by the court in *Register*, where it was seen that the purpose of section 365 was to enhance the debtor's financial prospects by permitting it to shuck "burdensome obligations." This—not subject to argument? Not, if you remember that troublesome little word that Congress (by wise design or by inadvertance) put in the statute and say: "burdensome *executory* obligations."

It is too rigid and too artificial to the Court here for every conceivable contract which a debtor may seek to reject under section 365 to be subjected to a judicial steel press and forced into a little square box marked either "executory" or "nonexecutory," with the result that the debtor may reject the one but not the other. Commonly, today, contracts run on for pages and pages, with exhibits and definitions and references. It seems obvious that some provisions will be executory in the sense of obligating *both* parties to perform something and that some provisions will not be (mutually) executory.

If the term "reject" in section 365 has any correspondence of meaning to the word "terminate," then, perhaps, rejection of an executory contract terminates all of the mutual-performance obligations but does not affect others which deal with the effect of termination. By the specific wording of this contract, termination (by either party) springs into place the debtor's agreement not to compete. Thus, termination of the contract was not intended to mean that the parties then were free to act as if the ended relationship had never existed, and no such result is to be attributed to the bankruptcy statute. The most-obvious continuing effect of a rejected contract is that rejection ordinarily constitutes a breach of the contract, giving rise to a claim for any resulting damages, and converts the other contract party into a creditor in the bankruptcy case.[6]

There is certainly no language in the bankruptcy statute, however, which provides that a claim for damages is the only shred of effect from rejection of an executory contract. The Court is unable to locate the general rule of golden logic which demands that, if a contract contains mutual, executory obligations which are onerous to the debtor and which the debtor rejects, the contract is thereby vaporized by nuclear fission (except for a claim for damages). This elusive, plasma-like rule that an executory contract must be assumed or rejected as a whole and not in part has the right kind of appealing ring to

---

5. Hon. Joel Pelofsky, formerly bankruptcy judge, Western District of Missouri.

6. See 11 U.S.C. §§ 365(g), 502(g), and 101(9)(B).

the ear but is not well-founded, unless it simply means that a debtor cannot "have its cake and eat it too," by assuming desirable executory contract obligations while rejecting the burdensome ones.

It is a bit cavalier for a debtor to obtain rejection of an executory contract whose performance is burdensome to it and then say that the only effect of rejection is the statutory breach usually resulting. The debtor is saying that the other party really can't complain about any other aspect of the breach, for all it has to do is file a proof of claim for the sum of its damages from the debtor's breach of contract. This treatment is seen to be rather heartless, however, when the new "creditor" finds itself confronted with a composition plan of reorganization, proposing that only—say—4% of such claims will be paid.

It seems more reasonable to interpret the statute to mean that the debtor can be relieved of performance of burdensome contract provisions tied to performance obligations of the other contracting party but not the effects of such termination of these executory obligations of the debtor. One of those effects here was that the debtor was permitted to engage in the trucking business with others but only outside of all geographic areas in which it had "operated for Redwing." There being no statutory language which expressly limits the effect of a debtor's rejection and resulting breach of an executory contract to the right of the other party to file a proof of claim for damages (of questionable worth), the Court concludes that the effect of the debtor's rejection of the Redwing contract did not relieve it of the obligation not to compete in business with Redwing. *In re Noco, Inc.*, 76 B.R. 839 (Bankr.N.D.Fl.1987) (dictum).

The debtor views its proposed contract with Fleet as a lease of property of the estate other than in the ordinary course of business, as dealt with in section 362(b)(1) of title 11, and the Court will so consider it in passing upon Redwing's objection. Since the performance of the contract by the debtor obviously would be done in violation of its obligation not to compete with Redwing's business, the debtor's conduct

would be wrongful and offensive to public morals. The new contract, therefore, cannot be held to be proposed in good faith by the debtor, and Redwing's objection is thus seen to be well-founded. It will be sustained.